LAW OFFICES OF SPENCER F. SMITH
DOW W. PATTEN, ESQ. Of Counsel (SBN: 135931)
353 Sacramento St., Suite 1120
San Francisco, California 94111
Telephone (415) 520-6950
Facsimile (415) 520-0104

Attorneys for Varun Paul

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VARUN PAUL, an individual,** | **CASE NO. 3:09-cv-04751-JSW** |
| **Plaintiff,** | |
| **vs.** | |
| | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| **PG&E CORPORATION, a California Corporation, PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation, and DOES 1-10,  individually, et al. ,** | |
| **Defendants.** | |

Comes now Plaintiff, VARUN PAUL and complains of Defendants as follows:

## PARTIES

1.     Plaintiff is an individual and resident of Berkeley, Alameda County, California, was at all relevant times herein employed by Defendant PACIFIC GAS AND ELECTRIC COMPANY ("PACIFIC GAS"), and/or PG&E CORPORATION, ("PG&E CORP.").

2.     Defendant PACIFIC GAS is a California Corporation, organized and existing under the laws of the State of California.

1

3.      Defendant PG&E CORP is a California Corporation, organized and existing under the laws of the State of California, and was at all relevant times the parent corporation of defendant PACIFIC GAS.

4.      Each Defendant, in doing the acts alleged herein, was acting as agent for the other within the course, scope, and authority of the agency.

5.      DOES 1 through 10, inclusive, are sued herein under fictitious names inasmuch as their true names and capacities are presently unknown to Plaintiff. Plaintiffs will amend this complaint to designate their true names and capacities when the same have been ascertained. Plaintiff is informed and believe, and on that basis allege, that Does I through 20, were agents, alter egos, or co-conspirators of PACIFIC GAS and/or PG&E CORP, or are otherwise responsible for all of the acts hereinafter alleged.

**JURISDICTION**

6.      This Court has jurisdiction over this matter based upon, the federal question of the Sarbanes-Oxley Whistleblower provisions of 18 U.S.C. § 1514A and pendent jurisdiction over Plaintiff's state law claims for violations of the California Fair Employment and Housing Act (the "FEHA").

7.      The amount in controversy exceeds the jurisdictional limit of this Court.

**VENUE**

8.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a).

**EXHAUSTION**

9.      In or about January 30, 2009, Plaintiff filed a formal complaint with the Department of Labor, case number 9-3290-09-027.

2

10.     More than 180 days have elapsed since the filing of PAUL's DOL Complaint, with no findings being made by the Assistant Secretary of the Department of Labor, nor decision made by an Administrative Law Judge.

11.     On or about August 6, 2009, Plaintiff, through his counsel of record sent via certified mail notice of intent to file the present action upon the Assistant Secretary of the Occupational Safety and Health Administration and the Associate Solicitor of the Fair Labor Standards Division of the Department of Labor; pursuant to 29 C.F.R. §1980.114, and more than 15 days have elapsed since that service.

12.     Plaintiff PAUL timely filed a complaint with the Department of Fair Employment and Housing setting forth the violations of the FEHA, and received a right-to-sue letter.

## **GENERAL ALLEGATIONS**

13.   Defendant PG&E CORP is a publicly traded company with one or more classes of securities registered under Section 12 of the Securities and Exchange act of 1934 and/or is required to file reports under section 15(d) of the Securities and Exchange Act of 1934, and is subject to the provisions of the Sarbanes-Oxley Act of 2002 ("SOX").

14.   Plaintiff was recruited by PACIFIC GAS in February of 2006 from the University of California at Berkeley into an exclusive leadership training program ("Undergraduate Leadership Program" or "ULP") for undergraduates graduating from the top five Business and Economics schools in the nation.

15.     The Undergraduate Leadership Program was a 3 year rotational program designed to develop young talent into tomorrow's Senior Analysts, Supervisors and Managers, in order to address the aging and retiring workforce of PACIFIC GAS.

3

16.    Plaintiff was one of four people recruited by PACIFIC GAS in 2006 into the ULP program, which offered numerous classes, field trips, trainings, career development trainings and various executive level projects with the expectation that the program member would then acquire some years of corporate work experience and eventually pursue an MBA either full time or part time and then graduate to the MBA Leadership Program, a more advanced version of the ULP.

17.    From 2006 to 2007, Plaintiff worked as a salaried employee at PACIFIC GAS and received high accolades, a bonus, and a pay increase in the Finance department, and was tapped to lead projects and aid Senior Executives with their projects.

18.    Examples of these projects included  a Nuclear Power Plant Process Audit, enabling PACIFIC GAS to retain its WANO certification with DOE-Nuclear Energy Regulatory Commission in 2006.  Plaintiff also presented a proposal on a pilot program to develop  training and course work for high school and community college students to pursue Utility Line Worker and related careers, as a hedge against PACIFIC GAS's aging employee base in those positions. PACIFIC GAS implemented Plaintiff's idea into its larger long term HR plan (Power Pathway). PACIFIC GAS implemented the community college portion in 2008 and Plaintiff sat on a working committee that advised on the community college program.   In 2009, PACIFIC GAS expanded the  program to begin including high schools, a facet Plaintiff advocated in 2007 and 2008.  Plaintiff also instituted a Supply Chain Business Intelligence effort that he created and executed that was later opened to 2 full time positions after Plaintiff's employment was terminated.

19.    In or about 2006, PACIFIC GAS changed the name of the ULP program to LEAD (Leadership Engagement & Development Program), and in 2007,  Plaintiff was able to rotate,

4

with the help of Human Resources to IT, where he served in a finance role, with a raise and promotion.

20.    In his second year at PACIFIC GAS, Plaintiff, with the encouragement of the PACIFIC GAS Human Resources department applied for a GMAT Course Prep program at Kaplan Test Preparation ("Kaplan").

21.    PACIFIC GAS's LEAD program, into which Plaintiff was recruited, made clear that entry into an MBA program was the goal of the LEAD program, with 100% tuition MBA school scholarships as the ultimate goal of the program.

22.    Plaintiff used the normal tuition refund program to study for entry into an MBA program, and PACIFIC GAS's Human Resources department enabled Paul to pick the best coursework program, led him on tours of local Universities, and hosted informational meetings.

23.    The LEAD program pointed to past tuition reimbursement users who enrolled in test preparation classes and were able to balance work and study, through PACIFIC GAS's benefits policy of flex-time for salaried employees, and based upon those policies and the representations of PACIFIC GAS personnel, Plaintiff continued his employment with PACIFIC GAS, looking forward to the same flex-work-study benefits that would allow him to study for the GMAT while continuing to work at PACIFIC GAS.

24.    In July of 2007 Plaintiff signed up with Kaplan for a GMAT preparation course, which consisted of three complementary and overlapping aspects: (1) One Month of Classroom Coursework; (2) Ongoing Tutoring Coursework; and (3) Ongoing Online Coursework. The cost of the course was $4,649.00.

25.    PACIFIC GAS paid 100% of the cost of Plaintiff's Kaplan course through its tuition reimbursement program.   In July 2007 PACIFIC GAS was aware of the fact that the classroom

FIRST AMENDED COMPLAINT

portion of the GMAT Tutoring course would begin on September 6, 2007 and ended on October 4, 2007.

26.    After his first year of exemplary performance Paul was given his 2007 performance evaluation.  Mr. Paul's supervisor provided in relevant part:

> Varun is a very truthful employee and is not afraid to admit mistakes or deficiencies in an open and direct manner.  Varun complies with all policies and standards. Varun worked long hours and even made himself available during scheduled vacations. Varun respects everyone's opinions and treats everyone with respect.  Varun is a truthful and trusted individual in the team.

27.    Paul also took initiative and engaged in business intelligence gathering for PACIFIC GAS and PG&E CORP, obtaining data on other utility companies, their pricing, initiatives, and risks, which PACIFIC GAS and PG&E CORP incorporated into its business model, creating two new positions for business intelligence analysts after terminating Paul's employment.

28.    In 2008, after completing the One Month Classroom Instruction at Kaplan, Paul rotated with salary and bonus promotion to Supply Chain Sarbanes-Oxley Group ("SOX Group"), where he continued his work/study in the LEAD program.

29.    Plaintiff's new manager in the SOX Group Manager, Carolyn Hiller ("Hiller"), was aware of Paul's participation in the LEAD program, his course of study, tutoring, and classroom work at Kaplan, which she called "class".   In his third rotation in the LEAD program, Plaintiff followed the expectations of the LEAD program by gaining promotions and moving through the firm's various departments to gain a wide base of experience, while readying himself to take the GMAT in 2008, so that in the years of 2009 or 2010, he would be ready to enter an MBA program, and formally graduate to PG&E's  MBA Leadership Program.

30.    At the time Plaintiff rotated in, the SOX group had only 4 employees:  Plaintiff, a female non-Indian-American, a male Caucasian, and a male Hispanic.

31.    Prior to accepting the rotational assignment to the SOX Group, Plaintiff requested from his prospective Manager that he be allowed to work from home on Fridays to complete his GMAT studies and coursework.

6

32.     Plaintiff's prospective Manager agreed and Plaintiff, in March, 2008,  gave his personal development Plan and goals to his Manager, Hiller, which contained a disclosure of all the time Plaintiff would have to spend preparing for the GMAT.

33.     Plaintiff's  personal development plan stated in relevant part: "complete the GMAT Prep Program: Three pronged approach - Tutoring, Class, Self Study - As per sign on agreement, use Fridays to complete these sub tasks to meet the Tuition Refund Requirements and take the GMAT Test in December 2008."  Hiller accepted the personal development plan without any changes.

34.     Upon rotating into the SOX Group, Paul was shocked at the level of fraud and malfeasance going on in PG&E's SOX Group, and was concerned that Hiller had not explained the compliance risks associated with his job.

35.     Within days of his arrival in the SOX Group Plaintiff was put in the midst of SOX compliance issues.  After approximately three weeks in the SOX Group,  was called in by his Director, Diane Thurman, and repeatedly interrogated about whether he wrote a letter informing of fraud to Internal Audit or the SOX PMO Office.

36.     In May 2008 Paul made his first SOX compliance complaint.  From this point on Hiller and Thurman engaged in a campaign of attrition, discrimination, and retaliation in an effort to create a pretext for the termination of Paul's employment.

37.     Without Plaintiff's knowledge, Plaintiff was paid less than his non-Indian-American counterparts in the SOX Compliance Group.

38.     Plaintiff successfully performed his duties in the SOX Compliance Group, improving the systems, test and audit methods used by PACIFIC GAS and PG&E CORP to quantify risks; however, he soon realized that the tests, systems, and methods of selection of data were so subjective and so subject to manipulation, that no real quantification of risk was occurring.

39.     Plaintiff made reports to his caucasian supervisor, Carolyn Hiller, Manager, Supply Chain SOX Compliance-PG&E, Diane Thurman, Director, Supply Chain Compliance-

7

PG&E, and others that the tests and systems in place to quantify the risks associated the PACIFIC GAS and PG&E CORP operations were not correctly quantify the risk.

40.    Plaintiff complained that the systems and tests designed to quantify risk in addition to not being correctly designed, were being manipulated by PACIFIC GAS staff and supervisors by selecting samples which were known to produce a passing result, rather than a random or quasi-random sample which would assess risk.

41.    As operated, the risk assessment performed under the tests and systems at PACIFIC GAS and PG&E CORP during this time period did not assess risk; rather the inputs and sample sizes for such tests, systems and audits were manipulated to produce a "pass" result with no true assessment of the risk.

42.    Plaintiff and his co-worker, a non-caucasian, complained that of the actions of PACIFIC GAS staff and supervisors in manipulating the data inputs and samples to always produce a "pass" result, but were repeatedly rebuffed by management and reprimanded.

43.    Plaintiff and his co-workers' complaints were based upon the reasonable belief that the defects in the auditing systems, tests, and the performance of those systems and tests were a violation of United States law governing securities, resulting in material misrepresentations concerning the supply chain risks faced by PACIFIC GAS and PG&E CORP, constituting a fraud upon Defendant PG&E CORP's shareholders and the securities markets.

44.    The complaints of Plaintiff and his co-worker were made to persons within the chain of command; including, Plaintiff's supervisor, and the director of risk management.

45.    Plaintiff was informed that the complaints made by Plaintiff and his co-worker would be investigated.  Upon information and belief, an investigation was commenced by PACIFIC GAS and/or PG&E CORP; however the results of that investigation were not made known to Plaintiff.

46.    Rather than address the issues raised by Plaintiff regarding SOX compliance and shareholder fraud, Plaintiff's chain of command began to focus on methods by which they could terminate Plaintiff's employment.

47.     Defendants violated their own internal policies and procedures in multiple respects throughout Plaintiff's employment in the SOX Group, including but not limited to the denial of basic HR procedures in place to investigate complaints of discriminatory treatment in the workplace and SOX-related complaints.

48.     Defendants' violation of its own internal policies and procedures included failing to respond to Plaintiff's requests to file formal complaints of discrimination and retaliation in the workplace, failing to investigate Plaintiff's claims, failing to document Plaintiff's complaints, removing Plaintiff's access to information sources to rebut false claims concerning his attendance, failing to document adverse employment actions, failing to provide written notice of Plaintiff's alleged violations of company policy, failing to permit Plaintiff the opportunity to review the allegations against him, failing to issue written findings concerning Plaintiff's complaints, and other violations of internal policies and procedures of which Plaintiff is currently unaware.

49.     As he had previously, in May, 2008, Plaintiff continued to telecommute without objection on Fridays; however, after Paul brought SOX compliance issues to his supervisors' attention his ability to telecommute or take flex time was severely restricted, with no legitimate employer purpose.

50.     In May, 2008, and at various times thereafter, Hiller began requiring Plaintiff to arrive at work at 8 a.m., unlike his Caucasian counterpart.   Plaintiff responded that his hiring agreement stated 9:00 a.m..  Hiller then began coming by Plaintiff's desk at 8:30 a.m. and using that as a justification to state that Plaintiff was not at his desk by 9:00 a.m.

51.     Plaintiff complained to Management that he was being treated differently than Caucasian and female employees in the department  as respects hours and leave.  PACIFIC GAS's official response was to tell Plaintiff that Managers in each group have wide latitude in enforcing and invoking the policies they wish.

52.     On May 28, 2008 Plaintiff and his Manager, Hiller, discussed his telecommuting on Fridays, a flex-time agreement negotiated prior to his acceptance of the rotation to the SOX group, with Plaintiff sending an email summarizing his telecommuting: "I started to use Fridays

9

to work from home, several weeks ago (rather that as soon as I was hired, in order to ease the transition).  I began to notice that tenured team members had telecommute -options at least two times a week or on an ad hoc basis.  I would often arrive to work with Will Santos and find that he and I were the only ones in the office, or us and Carolyn, and she wouldn't explain the disparity.  Thus, I formally asked her to achieve my rotational request to telecommute, in line with prior discussions and the precedence she set in allowing some to have it and not others."

53.     On or about June 12, 2008, Carolyn Hiller stated in front of Plaintiff's entire work group, "Indians are savages and pagans."  Although Plaintiff understood Hiller to be describing the wild west of the United States in the 1800s, the comment demonstrated to Plaintiff Hiller's lack of racial sensitivity and disregard for the culture and traditions of people of color like Plaintiff.

54.     Hiller  permitted Plaintiff's Caucasian and female counterparts to account for time when they were not doing work for the PACIFIC GAS as though they were doing work for PACIFIC GAS.  Plaintiff, along with his co-worker Will Santos brought this issue up to Human Resources, which responded that there was no issue.

55.     Over the next month Plaintiff made complaints to John Simon regarding being treated differently than other PACIFIC GAS employees based upon his race.

56.     Plaintiff provided evidence to his superiors of the disparate treatment he received, providing an email where his Caucasian male and non-Indian-American co-workers brag about being treated more favorably than Plaintiff  and his co-worker.

57.     In or about July, 2008, and continuing through November, 2008, Hiller began making false statements and reports that Plaintiff was coming to work late.  Hiller did not require Plaintiff's Caucasian and female counterparts to arrive on a set schedule.  When Plaintiff complained of the disparate treatment, Hiller told Plaintiff  to forget about it and gave Plaintiff verbal warnings to "deal with it, or we have no use for you", or words to that effect.

58.     On July 15, 2008, Plaintiff's Manager, Hiller, held a team meeting where she introduced Sybil Garrett, as the SOX group's new HR contact.  At the meeting Hiller attempted

FIRST AMENDED COMPLAINT

to take away the Friday telecommuting privileges of Plaintiff and his Hispanic male co-worker, who had also made SOX compliance complaints.

59.     On July 17, 2008, in retaliation for Plaintiff's complaints of unlawful employment practices and shareholder fraud, Plaintiff was informed that he could no longer telecommute on Fridays for his Kaplan course of study.

60.     On July 18, 2008, Plaintiff made another complaint to John Simon concerning the discriminatory and retaliatory nature of the adverse employment action of removing Plaintiff's pre-approved telecommuting schedule to study as part of the LEAD program.

61.     On July 19, 2008, PACIFIC GAS employee, Keith Jarus began investigating Plaintiff's co-worker's claims of discrimination and retaliation.

62.     Throughout this period, Plaintiff performed all the duties of his position competently, and his co-worker on July 21, 2008, write the following evaluation of his performance: "Varun Paul has been excellent to work with, particularly on AFPOs and Quarterly Sox Testing.  He is a proactive contributor who outputs excellent work product.  Varun clearly demonstrates the value of teamwork by ensuring that his teammates receive an equal share in the credit and successes of high profile projects, such as the AFPO project for Des Bell."

63.     On July 22, 2008 Plaintiff made another complaint of unlawful employment practices and shareholder fraud to Ed Kenney.

64.     In direct retaliation for Plaintiff's complaint of unlawful employment practices and share holder fraud, on July 28, 2008, Plaintiff's Manager Hiller again attempted to revoke Plaintiff's pre-approved telecommuting and flex time, an adverse employment action which materially altered the terms and conditions of Plaintiff's employment.

65.     On July 30, 2008, Babak Amirebrahimi wrote to PACIFIC GAS and stated in relevant part:  "This letter confirms that student Varun Paul has successfully completed a preparation course and part of his private tutoring for the GMAT exam through the Berkeley Kaplan Center from 09/06/2007 through 12/05/2007.  He completed all of his required assignments and has received the equivalent of a "Credit" grade…He still has some unused private tutoring hours that he is utilizing on Fridays.  He is expected to complete his hours for the

11

private instruction portion of the course by the end of October '08.  His course tuition of $4,649.00 included classroom and private instructions, textbook and other study materials, as well as 3 months of access to an extensive online resource syllabus."

66.     On August 18, 2008 Plaintiff received his midyear performance evaluation from his Manager, Hiller, and in retaliation for his complaints of unlawful employment practices and shareholder fraud, received a negative performance evaluation, with no mention of any issues related to Plaintiff's Kaplan course of study.

67.     In response to the mid-year review, Plaintiff also reminded Hiller that across the other departments, others, majority Caucasian, were not being treated like Plaintiff; others were getting better treatment and asked for far less work product.   When Plaintiff asked for assistance, Hiller went to the Director Thurman who did not immediately go to HR, nor talk to Plaintiff.   Plaintiff's complaint was ignored, despite PACIFIC GAS's policies requiring an investigation.

68.     In retaliation for his complaints related to discrimination, SOX and shareholder fraud, and in violation of PACIFIC GAS's own internal policies requiring progressive discipline, and with no prior notice to Plaintiff concerning his job performance, Plaintiff was placed on an "Improvement Plan" which denied Plaintiff pay increases. The improvement plan was focused almost exclusively on Plaintiff's personal characteristics and personality, rather than substantive issues with respect to the performance of his duties.

69.     Plaintiff confronted Carolyn Hiller about her disparate treatment of non-caucasians in her group.    Plaintiff complained that the mid-year performance review was untrue and unfair, that his work was constantly demeaned, that he was treated like a child, and given the most roadblocks on his work, while his Caucasian and non-male counterparts were not.

70.     Beginning in August, 2008, Plaintiff  was put on a "check-in plan" as a result of the retaliatory "Improvement Plan".   Hiller provided Plaintiff with handwritten comments stating that Plaintiff was meeting the expectations.   Hiller then began assigning Plaintiff high volumes of work. Plaintiff met the deadlines and promptly turned in the work product.   Hiller

FIRST AMENDED COMPLAINT

then gave the credit for the work performed by Plaintiff to Plaintiff's Caucasian peer, who had nothing to do with the assignment.

71.     As part of the hostile work environment, Hiller gave Plaintiff work assignments that by their very nature could not be completed.   Hiller assigned a project, Plaintiff would complete it, and then Hiller would change the terms of the assignment.   Hiller never put the requirements in writing, but requested new changes every time Plaintiff completed the assignment.   Plaintiff later learned that the work Hiller was assigning him was being dually assigned to others, non-Indian-Americans, to whom Hiller gave credit for Plaintiff's work.

72.     Plaintiff was denied a promotion, despite providing favorable feedback from internal clients and other people at PACIFIC GAS and despite being one of two people in the four person group that Hiller managed who had a superior education, references and experience. Instead, Plaintiff's supervisor, Hiller, treated Plaintiff like an intern.

73.     As part of the hostile work environment, Hiller repeatedly told Plaintiff that she wished she never hired Plaintiff.   When the opportunity to have Plaintiff transfer to another internal position, Hiller gave Plaintiff a negative performance review,  thereby preventing Plaintiff from moving up or even laterally within PACIFIC GAS.

74.     Plaintiff was held responsible for the work conducted by Hiller's favored employees: a Caucasian male and a female.  When Plaintiff's non-Indian-American counterparts didn't do their work properly, they were not disciplined nor had their credibility called into question. When Plaintiff assisted his non-Indian-American counterparts in completing their work, Hiller gave the credit to the counterparts, not Plaintiff.

75.     While in the SOX Compliance Group Plaintiff was consistently treated like an hourly employee even though he was salaried, in a continuation of the hostile work environment. Plaintiff's restroom breaks were monitored by his supervisor, Hiller,  unlike his Caucasian counterparts.

76.     Plaintiff  was discriminatorily denied accommodations (sick time, vacation, work life, work, etc) that were given to other (Caucasian) employees (flexible accommodations, time off, etc);  and denied the ability to rotate or transfer to another department within PACIFIC GAS,

13

through the ULP and/or LEAD mentorship program, which was offered to other ULP and/or LEAD program members who were either female or non-Indian-American and who had not made complaints of shareholder fraud.

77.     As part of the hostile work environment, Plaintiff was repeatedly accused of insulting his supervisor, or creating problems, but never given specifics or instances;  Plaintiff's non-Indian-American counterparts were not treated in this fashion.

78.     Near this time, someone ransacked Plaintiff's office space and stole files and other items from Plaintiff's work area.  When Plaintiff reported the issue to corporate security, Defendant PACIFIC GAS, in violation of its own policies and procedures, provided no response to Plaintiff, and upon information and belief did not investigate Plaintiff's complaint concerning his office space, files, and voicemail tampering.

79.     In September and October, 2008, Plaintiff took several days of sick leave. Thereafter, as part of the hostile work environment, and in violation of the HIPAA, Hiller demanded to see Plaintiff's actual medical records rather than a doctor's note.   Hiller questioned Plaintiff as to whether he was truly sick or playing games or being fraudulent.   Hiller threatened Plaintiff when he took sick time and said, "we may not have use for you." Hiller did not treat Plaintiff's non-Indian-American counterparts in this fashion nor those who had made no complaints of shareholder fraud.

80.     On September 8, 2008 Plaintiff again complained of disparate treatment and a hostile work environment in the workplace based upon his race.

81.     In retaliation for Plaintiff's complaints of unlawful employment practices and shareholder fraud, on was further subjected to unwarranted scrutiny of his time, his use of leave, and his use of telecommuting, being subjected to demands for medical proof of illness, unlike his non-Indian-American counterparts who had made no complaints of shareholder fraud and SOX compliance issues.

82.     In further discriminatory treatment retaliation for Plaintiff's complaints of unlawful employment practices and shareholder fraud, Defendants ceased to provide Plaintiff the benefits of the ULP and/or LEAD program into which Plaintiff was recruited; specifically,

FIRST AMENDED COMPLAINT

denying Plaintiff a VP-level mentor that his female and non-Indian American program participants received, denying Plaintiff the ability to rotate to another group within PACIFIC GAS, and blacklisting Plaintiff from the special projects, meetings, and other emoluments of the ULP and LEAD program, all to Plaintiff's damage.

83.     On or about September 8, 2008, from 10:00 a.m. to 10:30 a.m., Plaintiff and his co-worker reported the discrimination, hostile work environment,  and retaliation described above to the HR representative, Sybil Garrett.   Near the end of the meeting, Plaintiff told Garret that he had to report racial discrimination, based upon issues, comments and items. Rather than provide Plaintiff the information necessary to formalize his complaint of discrimination in the workplace under PACIFIC GAS's internal policies and procedures, Garret stopped the meeting, telling Plaintiff that "this is not the place or time to discuss this. I will tell your Director and someone else from HR will contact you", or words to that effect.

84.     Almost immediately after the September 8, 2008 meeting, Garret and Hiller started an investigation, not into Plaintiff's complaints of discrimination and hostile work environment, but into Plaintiff's use of flex-time and LEAD benefits.  The investigation commenced by Garret and Hiller occurred in close temporal proximity to Plaintiff's complaint of discrimination and hostile work environment, which presumptively establishes causation for retaliation.

85.     Rather than investigate Plaintiff's complaints by interviewing persons in the SOX Group to determine whether unlawful workplace practices were occurring, Hiller, Thurman, and Garret hijacked the normal EEO and shareholder fraud investigation process, turning it on its head, and began an investigation of Plaintiff to try to find some pretextual basis for terminating Plaintiff's employment.

86.     Plaintiff waited for someone in HR to contact him concerning his racial discrimination and hostile work environment claims, to no avail.  Plaintiff waited for one and half months, and in late October, 2008,  complained again, this time to Diane Thurman concerning the racial discrimination and hostile work environment.

87.     Thurman stated that she knew about Plaintiff's allegations of racial discrimination

FIRST AMENDED COMPLAINT

and hostile work environment but didn't think it was a big deal.   Thurman attempted to dissuade Plaintiff from pursuing his claims of racial discrimination and hostile work environment, but Plaintiff asked Thurman to talk to HR's EEO team.  Thurman stated she would get back to Plaintiff, but in violation of PACIFIC GAS's own policies and procedures and in violation of well-established norms for the investigations of unlawful practices in the workplace, Thurman hijacked the EEO process to ensure that Plaintiff's complaint of discrimination would not be formally recorded before she could terminate Plaintiff's employment based upon the pretextual investigation into Plaintiff's use of flex-time.

88.     In retaliation for this further complaint of discrimination, Hiller and her superiors conducted an investigation into Plaintiff's educational work at Kaplan.

89.     Compared to Plaintiff's non-Indian-American counterparts, Plaintiff was one of the least frequent users of sick time, yet his counterparts did not receive the excess scrutiny and threats that Plaintiff did.   Plaintiff  complained about his findings after reviewing sick leave usage in the department to HR's Senior Vice President.  He forwarded this claim to Thurman, who then, rather than investigate, accused Plaintiff of sick leave abuse in writing.  After Plaintiff began showing the time sheets to the various parties, Thurman and Hiller removed Plaintiff's access to the timesheets.

90.     In contrast to other salaried employees, Plaintiff was subjected to unfair treatment, being denied flex-time benefits given to other non-Indian-American salaried employees, and being treated as an hourly employee, while on the other hand being a salaried employee working more than forty (40) hours per week without the right to statutory compensation for overtime and other benefits of being an hourly employee.

91.     As part of the retaliatory investigation, a Corporate Security representative, conducted an abusive interview of Plaintiff, accusing him of a variety of unethical acts.  Plaintiff countered that he had rights as a citizen, to which the representative replied,  "I don't care about your rights" or words to that effect.

92.     Previously, on more than three occasions, Plaintiff had provided PACIFIC GAS proof that Plaintiff had completed his Kaplan classroom work and was conducting the remaining

FIRST AMENDED COMPLAINT

course work.   Plaintiff's Caucasian counterpart was also taking classes and was allowed to skip assignments, leave early, arrive late for work,  and was not required to obtain signed letters confirming his study.

93.     In early November, 2008, after the decision to terminate Plaintiff's employment had been made, PACIFIC GAS's  Human Resources department belatedly commenced an investigation into months of racial discrimination and hostile work environment complaints by Plaintiff.  HR scheduled a meeting for November 5, 2008 to interview Plaintiff concerning his allegations of racial discrimination and hostile work environment.   In an effort to avoid the investigation, Hiller and Thurman summarily terminated Plaintiff's employment on November 3, 2008; thereby ensuring that an internal investigation of Plaintiff's complaints would never occur.

94.     In retaliation for Plaintiff's complaints of unlawful employment practices and shareholder fraud, and as part of its discriminatory campaign of attrition against Plaintiff, PACIFIC GAS and/or PG&E CORP instituted an unwarranted investigation into Plaintiff's use of telecommuting, and on October 23, 2008 Ed Kenney interrogated Plaintiff related to falsification of timecards and Plaintiff's telecommuting on Fridays from March of 2008 through October of 2008.

95.     On November 3, 2008, in retaliation for Plaintiff's complaints of unlawful employment practices and shareholder fraud, and as part of its discriminatory campaign of attrition against Plaintiff, Defendants terminated Plaintiff's employment.

96.     In a final insult, after Plaintiff's termination, PACIFIC GAS's HR department contacted Plaintiff, asking if he wished to pursue a claim of racial discrimination and hostile work environment.

## **FIRST CAUSE OF ACTION:**
## **RETALIATION IN VIOLATION OF 18 U.S.C. §1514A, et. Seq.**

97.     Plaintiff re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 96 above, as though set forth fully herein.

98.     Plaintiff engaged in protected activity within the meaning of 18 U.S.C. §1514A(a) by causing information to be provided regarding misconduct by PG&E CORP which Plaintiff

FIRST AMENDED COMPLAINT

reasonably believed to constitute a violation of 18 U.S.C. §1348 (Securities Fraud) and/or rules and regulations of the Securities Exchange Commission and/or federal law relating to fraud against shareholders to persons with supervisory authority over the Plaintiff and/or other persons within PG&E with the authority to investigate, discover, or terminate the misconduct.

99.     Defendants were actually or constructively aware that Plaintiff engaged in the protected activity.  Evidence of such knowledge includes the commencement of an investigation into Plaintiff's furnishing of information concerning misconduct related to the understatement of risks posed by Defendants' supply chain systems, audits and tests.  Further evidence of such knowledge includes correspondence between Plaintiff and his supervisor, and the head of the department, and the head of risk management, including Senior Vice President-John Simon, the Director of the group Carolyn's Boss, Diane Thurman, HR Rep, Sybil Garret, HR Rep Paula Jean, HR Rep Keith Jarus,  HR Rep Leona Carter,  Corporate Attorney Stacy Campos, Corporate Security Ed Kenney, and Bob Puts.

100.     Plaintiff along with his co-worker organized, wrote and presented a formal PowerPoint presentation to Senior Director Charles Twamugabo, detailing various shareholder fraud and SOX non-compliance issues in the Supply Chain department, including inventory pictures, numbers, and operational methods that presented material risks to Defendants that were material to the overall financial and operational risks of the companies.

101.     Plaintiff along with his co-worker requested a meeting concerning their reports of shareholder fraud with the Senior VP of Risk management, the VP of Supply Chain, the Controller, the CFO and the CEO, and were denied the opportunity to present their evidence further up the chain of command.

102.     Plaintiff requested to meet with external auditors concerning the re-testing or re-certification of SOX control results, as was commonplace during external assessments; however, Plaintiff was not permitted to meet with external auditors in an attempt to cover up the systemic failures and the resulting shareholder fraud which Plaintiff had reported to the chain of command.

103.    Defendants subjected Plaintiff to an adverse employment action in violation of SOX by summarily terminating his employment on or about November 3, 2008, and other adverse employment actions set forth above.

104.    Defendants further subjected Plaintiff to adverse employment action by instituting a discriminatory and retaliatory investigation into Plaintiff's attendance, obtaining Plaintiff's test preparation service records without his permission, performing credit checks upon Plaintiff and his father, and engaging in unwarranted surveillance of Plaintiff.  In particular, Defendants had no legitimate business purpose to perform a credit check of Plaintiff's father, and violated both state and federal laws in its retaliatory and unlawful investigations.

105.    The proximity in time between Plaintiff's protected activity and the adverse employment actions are sufficient to raise an inference that the protected activity was likely a contributing factor in the adverse employment action.

106.    Further evidence that Plaintiff's protected activity was a contributing factor in the adverse employment actions is that Defendants attempted to cover up the failures, test sample manipulations, and audit result manipulations of which Plaintiff and his co-worker had complained, and the termination of  Senior Director Charles Twamugabo's employment. WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

### SECOND CAUSE OF ACTION:

### RACE DISCRIMINATION IN VIOLATION OF THE FEHA

### CAL. GOV. CODE §12900 ET. SEQ.

107.    Plaintiff re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 106 above, as though set forth fully herein.

108.    The foregoing conduct violates California Government Code Section 12900, *et seq.*

109.    Defendant through its agents and employees engaged in a pattern and practice of unlawful race discrimination in violation of the FEHA in connection with its treatment of

Plaintiff and the terms and conditions of his employment, including disparate treatment discrimination in pay and leave and hostile work environment discrimination.

110.    At all relevant times, Defendant had actual and constructive knowledge of the discriminatory conduct described and alleged herein, and condoned, ratified and participated in the discrimination.  As a result of the disparate treatment of Plaintiff, the hostile work environment,  and Defendant's failure to protect Plaintiff from further discrimination, Plaintiff suffered severe emotional distress.

111.    Plaintiff is informed and believes and thereon alleges that in addition to the practices enumerated above, Defendant has engaged in other discriminatory practices against Plaintiff, which are not yet fully known.  When said discriminatory practices become known to Plaintiff, he will seek leave of court to amend this complaint in those regards.

112.    As a direct and proximate result of the willful, knowing, and intentional discrimination against Plaintiff, and the failure to act by defendants, Plaintiff has suffered mental distress, anguish, and indignation.  Plaintiff is thereby entitled to general and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## THIRD CAUSE OF ACTION:

## RETALIATION IN VIOLATION OF THE FEHA

## CAL. GOV. CODE §12900 ET. SEQ.

113.    Plaintiff re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 112 above, as though set forth fully herein.

114.    In June, 2008, and at other times, Plaintiff engaged in a protected activity by complaining of disparate treatment, hostile work environment and unlawful employment practices under the FEHA.

115.    As a direct and proximate result of such protected activity, Defendant PACIFIC GAS, through its agents, caused Plaintiff to suffer adverse employment actions, including but not

FIRST AMENDED COMPLAINT

limited to placing withholding pay and bonuses,  instituting unwarranted investigations against Plaintiff,  subjecting Plaintiff to heightened scrutiny, and terminating Plaintiff's employment without progressive discipline.

116.    Defendants retaliated against Plaintiff  by engaging in the conduct set forth above and by maintaining an environment of hostility and abuse, and failing to stop Hiller and Thurman from perpetuating a hostile work environment for Plaintiff.

117.    As a result of the unlawful behavior perpetrated and executed by Defendants, and Defendants' failure to protect Plaintiff from unlawful behavior, he has suffered severe emotional distress, humiliation and embarrassment.  As a further proximate result of such conduct, Plaintiff has suffered loss of income, loss of advance and promotions, loss of career opportunity and loss of tangible job benefits, all in amounts to be proven at trial.

118.    Plaintiff is informed and believes and thereon alleges that in addition to the enumerated practices above, Defendant have engaged in other unlawful practices against Plaintiff which are not yet fully known.  At such time as said retaliatory practices become known to Plaintiff, he will seek leave to amend this complaint to include such retaliatory practices.

119.    As a direct and proximate result of Defendant's willful, knowing, and intentional acts, and Defendants' failure to act, Plaintiff has suffered and will continue to suffer mental distress, anguish, and indignation.  Plaintiff  is thereby entitled to general and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiff has been damaged and prays judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    For general damages according to proof, however, no less than the jurisdictional limit of this court;

2.    For damages due to reputational harm;

3.    For special damages in amounts according to proof;

FIRST AMENDED COMPLAINT

4.       For attorneys' fees as provided by law;

5.       For interest as provided by law;

6.       For cost of suit incurred herein; and

7.       For such other and further relief as the Court deems fair and just.

<u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury of all matters so triable.


Dated: November  4, 2009                    LAW OFFICES OF SPENCER SMITH



                                        ***/S/ DOW W. PATTEN***
                                          DOW W. PATTEN, Of Counsel
                                          Attorneys for Varun Paul

FIRST AMENDED COMPLAINT